UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CR-0128-001 & 002-CVE |
| | ) | |
| | ) | |
| DAROWE JUNIOR JONES, | ) | |
| a/k/a Darowe Jones, Jr., and | ) | |
| CYNTHIA SANTAGATA, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are defendants Darowe Junior Jones's and Cynthia Santagata's motions to suppress evidence (Dkt. ## 40, 41). In March 2017, defendants were arrested and charged with felonies under Oklahoma state law in the District Court in and for Tulsa County, Oklahoma. When defendants failed to appear in state court based on their March 2017 arrests, a state court judge issued a fugitive arrest warrant for each defendant.[1] On April 17, 2018, Tulsa Police Department (TPD) officers executed the arrest warrants for both defendants. Jones and Santagata are now charged by indictment in federal court with fifteen and eleven counts, respectively, stemming from defendants' alleged conspiracy to possess with intent to distribute methamphetamine, heroin, cocaine, and marijuana. Dkt. # 48. Each defendant filed a motion to suppress all evidence obtained as a result of the events that took place on or about April 17, 2018.

---

[1] Significantly, the Court takes judicial notice of Tulsa County District Court records in Case No. CF-2017-1852 showing that a state court judge issued an arrest warrant for Santagata on March 23, 2017 and a bench warrant for Jones on March 2, 2018. See Oklahoma State Courts Network (OSCN), http://www.oscn.net/dockets, last visited September 24, 2018; United States v. Ahidley, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (noting that federal courts may take judicial notice of publicly-filed records in other courts).

Dkt. ## 40, 41. On September 14, 2018, the Court held an evidentiary hearing on defendants' motions. See Dkt. ## 89.

**I.**

At the evidentiary hearing, TPD Officer Joshua Ledbetter, TPD Officer Michael Cawiezell, and TPD Detective Lance Bond testified as follows:

### A. Officer Joshua Ledbetter

Officer Ledbetter is an officer with the TPD and is currently, and at all times relevant to the instant matter was, assigned to the fugitive warrants unit. On approximately April 16, 2018, Officer Ledbetter began a fugitive investigation into Jones, whose name was included on Special Investigations Division (SID)'s list of top ten fugitive warrants. Officer Ledbetter reviewed the file associated with Jones, including pictures of Jones and Santagata, information regarding the March 2017 arrests, and the outstanding arrest warrants for both defendants. The information contained in Jones's file also indicated to Officer Ledbetter that Jones drives a black 2007 GMC Yukon Denali. Officer Ledbetter also reviewed pictures of Camellia Santagata, defendant Santagata's sister, after learning that Santagata and Camellia are both listed on the utilities at a residence located at 1336 North Cheyenne Avenue, Tulsa, Oklahoma. In addition, Officer Ledbetter drove by 1336 North Cheyenne Avenue and saw a Hyundai Tucson parked out front, which he confirmed to be registered to Camellia.

Officer Ledbetter learned from Officer Cawiezell, who was working on the narcotics side of the investigation, that Jones is associated with the address 3236 South 140th East Avenue, Tulsa, Oklahoma. At approximately noon on April 17, 2018, Officer Ledbetter drove by 3236 South 140th East Avenue. Parked in the driveway was a black 2007 GMC Yukon Denali, which he believed to

be the car Jones drives. With the goal of finding Jones and arresting him on the fugitive arrest warrant, Officer Ledbetter pulled into the driveway of a home approximately three or four houses north of and across from 3236 South 140th East Avenue, and set up surveillance. He radioed additional officers, including Officer Cawiezell, to inform them that he believed he had located Jones. Office Ledbetter used binoculars to conduct his surveillance throughout the day.

### 1.  Surveillance and Arrest of Defendant Santagata

Approximately two to three hours into his surveillance, Officer Ledbetter observed Camellia pull up to 3236 South 140th East Avenue in her Hyundai Tucson, and park in front of the house. He observed Camellia exit the car and enter the home through the front door. Approximately fifteen minutes later, he observed the garage door open and a black Chrysler 300 back out of the garage, turn north, and drive past his vehicle. Officer Ledbetter testified that the side windows of the vehicle were tinted, as was the very top of the windshield; however, through the front windshield of the Chrysler, he observed Santagata driving the vehicle and Camellia sitting in the passenger's seat. Officer Ledbetter radioed to the other officers stationed in the area that Santagata was driving northbound on South 140th East Avenue. The other officers in the area took over the arrest while Officer Ledbetter continued his surveillance. Officer Ledbetter confirmed with the other officers that they had taken Santagata into custody for her outstanding felony warrant.

On cross examination, Officer Ledbetter testified that he did not find any residence documents that had the address of 3236 South 140th East Avenue in defendant Santagata's name, that he had not identified the black Chrysler 300 as belonging to any particular person, and that he could not recall whether the driver of the Chrysler 300 was wearing sunglasses, a hat or any other

items that would cover his or her face. He confirmed that he conducted his surveillance by looking through his vehicle's rear passenger window.

### 2. Arrest of Defendant Jones

Officer Ledbetter remained near 3236 South 140th East Avenue during and following Santagata's arrest. He spoke to two occupants of the house directly south of 3236 South 140th East Avenue, and showed them pictures of Jones and Santagata. The neighbors confirmed that the man in the picture (Jones) drives the black GMC Yukon and that the female in the picture (Santagata) drives the Chrysler 300. They informed Officer Ledbetter that they had seen Jones pull up to the house in the black 2007 GMC Yukon earlier that morning, and they explained that there was a lot of activity at the house. Officer Ledbetter testified that he had developed enough information at that point to believe Jones was inside 3236 South 140th East Avenue. Therefore, members of the Northern Oklahoma Violent Crimes Task Force and the Organized Gang Unit (OGU)[2] surrounded the home to attempt to contain and call out Jones. Dkt. # 85-1, at 2.

First, the officers approached the residence[3] through the garage. One officer had obtained the garage door opener from the vehicle stop of Santagata and brought it to Officer Ledbetter, who used it to open the garage door of the residence. When the officers entered the garage, they cleared the utility room and looked inside a trash can to make sure no one was hiding in it. Officer Ledbetter testified that during this initial entry into the garage, he did not search any area in which

---

[2] On cross examination, Officer Ledbetter testified that members of the OGU were present because he was working with that unit in obtaining information in reference to the fugitive investigation. Officer Cawiezell is part of the OGU.

[3] On re-direct examination, Officer Ledbetter testified that as the officers were approaching the residence, Santagata confirmed to the officers that were interviewing her that Jones was in the house when she left.

4

a person could not fit, he did not find or look for any evidence, and no officers brought him any evidence. At that point, the officers decided that it did not make sense to call Jones out from the residence through the garage, so they exited the garage and approached the front door instead. When he approached the front door, Officer Ledbetter smelled a very strong odor of marijuana. On cross examination, Officer Ledbetter specified that he was on the front porch, approximately three to four feet from the front door, when he smelled burnt marijuana. The officers made several announcements and pounded on the door, yelling for Jones to exit the residence. This continued for approximately five minutes with no response, at which time the officers broke the glass on the front door. They continued their announcements, but still received no response. The officers then breached the door with a ram, which damaged the door and its locking mechanism. Once again, the officers continued to make announcements, but did not receive a response. At that point, Officer Clint Jordan came to the front door with his canine partner, and made several announcements that he had a canine and he was going to let the dog loose. Finally, Jones emerged from the kitchen. Jones followed the officers' commands, walked towards them, and was taken into custody.

Officer Ledbetter testified that, once Jones was taken into custody, Officer Cawiezell went to obtain a search warrant to search the residence based on the smell of marijuana from outside the home. While waiting for the search warrant, the other officers planned to stay behind to secure the residence. Because the officers would be securing the residence for a long period of time, Officer Ledbetter and others conducted a protective sweep to clear the residence of any persons or threats to officer safety. Officer Ledbetter testified that the protective sweep included a search only of places in which a person could hide. He did not look for or find any evidence during the protective sweep. Moreover, no officers brought evidence to him during the protective sweep. Following the

protective sweep, Officer Ledbetter left the scene and booked Jones into jail with Department of Corrections Agent Ray Gooldy.

When Officer Ledbetter returned to the residence, the other officers were already executing the search warrant. Officer Ledbetter assisted in searching the garage. Inside the garage was a small freezer, which the officers moved to boost an officer up into the attic to search it. Before doing so, however, Officer Ledbetter decided to search the freezer. He found a Tupperware container containing a large quantity of what he believed to be black tar heroin, as well as a white powder substance. Officer Ledbetter handed the evidence to a group of officers in the kitchen, where all evidence was being collected.

On cross examination, Officer Ledbetter testified that he was not looking for Jones for any reason other than to arrest him on his outstanding warrant, and he had no reason to believe that Jones had committed any additional crimes. Further, he testified that the only person he had any information or reason to suspect was inside the home following Santagata's arrest was Jones; however, he also testified that he did not know who was in the residence at the time. Finally, Officer Ledbetter admitted that he did not look in the attic during the protective sweep.

B.  Officer Michael Cawiezell

Officer Cawiezell is a law enforcement officer with the TPD and a member of the SID. At all times relevant to the instant matter, Officer Cawiezell was a member of the OGU. Officer Cawiezell testified that he had been conducting an investigation into Jones for a few months prior to April 17, 2018. He had obtained a ping warrant for Jones's cell phone and, based on his monitoring of the pings, he had identified 3236 South 140th East Avenue as a potential location for Jones.

Officer Cawiezell testified that on April 17, 2018, Officer Ledbetter notified him that he believed he had located Jones at 3236 South 140th East Avenue and that Officer Cawiezell could come assist in arresting Jones if he would like to complete his investigation. Officer Cawiezell assisted in executing the arrest warrant for Jones at 3236 South 140th East Avenue. Officer Cawiezell looked inside the garage while the other officers entered it to call Jones out of the residence. However, Officer Cawiezell testified that he did not enter the garage or find any evidence at this time. Moreover, no officer brought him any evidence at this time.

Officer Cawiezell confirmed that the officers decided not to execute the arrest warrant through the garage, so they exited it and approached the front door of the residence instead. As the other officers approached the residence, Officer Cawiezell stayed about fifteen feet from the front door and did not enter the front porch. From that distance, he smelled an overpowering odor of marijuana. On cross examination, Officer Cawiezell specified that he smelled raw marijuana.

Once Jones was in custody, Officer Cawiezell informed all officers present that he intended to write an application for a search warrant, and he requested that they stand by the residence while he obtained a warrant. At 6:39 p.m. on April 17, 2018, Officer Cawiezell wrote a search warrant application for the residence located at 3236 South 140th East Avenue. After Tulsa County Judge Moody signed the search warrant for marijuana, instrumentalities used in the sale of marijuana, fruits and other controlled dangerous substances (Dkt. # 85-3, at 4), Officer Cawiezell returned to the residence at 3236 South 140th East Avenue. When he returned, all officers were standing outside, and there were no officers inside the home or garage. At that time, the officers executed the search warrant. While the other officers searched the residence, Officer Cawiezell took photographs, recovered evidence, and collected the evidence in the kitchen area of the residence.

While in the kitchen, Officer Cawiezell smelled an odor of marijuana nearby. He searched the oven and found marijuana inside. He confirmed that no officer gave him any reason to believe there might be evidence in the oven. Officer Cawiezell testified that he received the heroin from Officer Ledbetter while in the kitchen. Moreover, Officer Cawiezell testified that there was a firearm found in the residence, and he believed that it was found in an upstairs bedroom after the search warrant was obtained. Finally, Officer Cawiezell confirmed that he did not have any reason to believe that any officer had searched for or found any evidence prior to obtaining and executing the search warrant.

On cross examination, Officer Cawiezell testified to his division's typical procedure for conducting searches. Specifically, when his division conducts a search, the officers break off into different rooms. When evidence is found, the officer photographing the evidence documents it and then collects the evidence. Often, after an officer has searched a room, the officer in charge has other officers look in the room to make sure that nothing was overlooked. Officer Cawiezell testified that he believed the evidence in this case was collected in accordance with SID's typical procedure. Officer Cawiezell testified that Sergeant Evans of SID was in charge of the scene during the search, and he confirmed that SID took over the investigation once Jones was arrested. Further, Officer Cawiezell believed he had probable cause for the issuance of a search warrant once he smelled marijuana outside the home and, at that point, he determined that he would apply for a search warrant. While obtaining the warrant, Officer Cawiezell was absent from the scene for over an hour. Officer Cawiezell admitted that he could not testify as to what happened at the residence during that period of time because he was not there. Finally, once Officer Cawiezell obtained the

search warrant, he contacted Officer Barnhardt, who was present at the scene, and told him that he had obtained the warrant.

### C. Detective Lance Bond

Detective Lance Bond is a detective with the TPD's fugitive warrant squad. On April 17, 2018, at approximately 2:00 to 3:00 p.m., he arrived at 3236 South 140th East Avenue to assist Officer Ledbetter in his investigation of Jones. Detective Bond testified that he was present during the officers' initial entry into the garage prior to Jones's arrest. He confirmed that the officers were inside the garage at that time because they had initially planned to enter through the garage. While inside the garage, Detective Bond was positioned as the first officer and was holding a ballistic shield. He testified that the purpose of the ballistic shield is to protect officers from any threats inside the home, and he believed that there was a threat of Jones possibly having a weapon or of any other person trying to harm the officers. However, Detective Bond also testified that he did not have any reason to believe that there were weapons in the house, because he did not review Jones's file. As Detective Bond passed by the trash can inside the garage, other officers checked inside it. He believed the trash can was large enough to fit a person, and he described it as a large trash bin from the city. Aside from the trash bin, the garage was fairly empty and he felt comfortable that there was no one inside the garage at that time. Detective Bond confirmed that he did not search the attic during the initial entry into the garage, because he was not concerned about officer safety with respect to that location. Detective Bond testified that the officers decided that it was not the best course of action to enter through the garage due to officer safety concerns; therefore, the officers backed out of the garage and made announcements from the front door.

While Officer Cawiezell was away from the scene to obtain the search warrant, Detective Bond remained at 3236 South 140th East Avenue to assist in securing the scene and making sure no one entered or exited the residence. At this time, Detective Bond assisted in the protective sweep for any threats to officers inside the residence and any other persons inside the residence, which lasted approximately five to ten minutes. He testified that during the protective sweep, he did not look in any areas in which a person could not fit, he did not search for or find any evidence, and no other officer brought evidence to him or told him about having found evidence during the protective sweep. After the protective sweep but prior to Officer Cawiezell returning with the search warrant, Detective Bond remained outside the residence in the front yard and he stood in front of the door that they were unable to lock due to damage. He testified that all officers were outside during that time, and no one went back into the house after the protective sweep was done but before the search warrant was obtained. Once the search warrant was obtained, Detective Bond assisted the officers in searching the residence.

On cross examination, Detective Bond testified that between noon and 2:00 p.m., he was stationed south of 3236 South 140th East Avenue, on a street that runs east to west. Further, Detective Bond confirmed that Officer Ledbetter was stationed in the driveway of the home Officer Ledbetter described in his testimony as the one from which Officer Ledbetter conducted surveillance. Detective Bond was not able to see 3236 South 140th East Avenue from where he was stationed, so he did not see Santagata leave the residence.

Also on cross examination, Jones's counsel asked Detective Bond why he was not concerned about officer safety with respect to the attic while conducting the sweep of the residence. Detective Bond explained that, based on where the freezer was located, he did not believe that someone could

adequately gain access to the attic. However, Detective Bond agreed that someone could have used a ladder to get into the attic and then pulled the ladder up. Further, he admitted that the attic space is a place that could be cleared for officer safety, and that it was not cleared in this case.

The Court finds that all three witnesses were credible.

## II.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).

A.  Defendant Santagata's Motion to Suppress

Investigative detentions are Fourth Amendment seizures of limited scope and duration. Terry v. Ohio, 392 U.S. 1, 16 (1968); Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007). Investigative detentions are lawful "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter . . . is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229 (1985). "Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993).

Here, the officers seized Santagata when they stopped her vehicle. In her motion to suppress (Dkt. # 41), Santagata argues that the officers lacked reasonable suspicion to conduct the stop. Specifically, Santagata argues that Officer Ledbetter could not have identified her as the driver of

the Chrysler 300 and that Officer Jordan did not observe Santagata commit a traffic or equipment violation. Therefore, Santagata argues, all evidence resulting from the stop should be suppressed.

The Court finds credible Officer Ledbetter's testimony that he was able to identify Santagata as the driver of the Chrysler 300. Prior to conducting surveillance on April 17, 2018, Officer Ledbetter had reviewed pictures of Santagata and Camellia, and he knew that Santagata is associated with Jones, that Jones is connected to the residence located at 3236 South 140th East Avenue, that Jones drives a black 2007 GMC Yukon, and that Camellia drives a Hyundai Tucson. Further, before encountering Santagata that day, he had already identified Jones's vehicle in the front of the residence, and had observed Camellia pull up in her Hyundai Tucson and enter through the front door of the house. Just fifteen minutes after observing Santagata's sister enter the home, Officer Ledbetter observed a Chrysler 300 back out of the garage at 3236 South 140th East Avenue, turn north, and drive past him. Officer Ledbetter testified, and Detective Bond confirmed, that he was stationed approximately three or four houses north of and across from 3236 South 140th East Avenue when the Chrysler 300 left the residence. Therefore, when the vehicle turned north onto South 140th East Avenue, it was moving towards Officer Ledbetter, allowing Officer Ledbetter the opportunity to see through the vehicle's front windshield and to identify the occupants before it passed him. Further, because Officer Ledbetter made the identification through the front windshield of the car, the fact that the side windows and the very top of the windshield of the Chrysler 300 are tinted does not make his testimony any less credible. Moreover, although Officer Ledbetter did not recognize the Chrysler 300 as belonging to any particular person or have any residence documents for 3236 South 140th East Avenue bearing Santagata's name, the Court finds that such evidence is unnecessary where Officer Ledbetter identified Santagata on sight. Thus, the Court finds credible

Officer Ledbetter's testimony that he was able to identify Santagata as the driver (and Camellia as the passenger) of the Chrysler 300 at that time.

The Court also finds credible Officer Ledbetter's testimony that, after making this identification, he informed the other officers in the area via radio that Santagata was driving a black Chrysler 300 northbound on South 140th East Avenue. Therefore, Officer Jordan had reasonable suspicion to believe that the driver of a black Chrysler 300 driving north on South 140th East Avenue was a fugitive subject to a felony arrest warrant, and he was justified in stopping Santagata's vehicle to conduct an investigative detention on that basis and he did not need to observe Santagata committing a traffic or equipment violation prior to doing so. Accordingly, Santagata's motion to suppress (Dkt. # 41) should be denied.

B.  Defendant Jones's Motion to Suppress

Defendant Jones argues that all evidence recovered from the officers' search and flowing from its recovery must be suppressed, because the officers entered the residence and searched the premises before obtaining a search warrant.

"It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures." Maryland v. Buie, 494 U.S. 325, 331 (1990). Here, the officers had an arrest warrant for Jones and subsequently obtained a search warrant for the residence. Moreover, Jones does not dispute the validity of the search warrant. Rather, the only question is whether the officers searched the premises for evidence prior to obtaining the search warrant. Therefore, the Court finds that the argument raised by Jones is more factual than legal.

The Court finds that, based on the officers' testimonies, the officers had entered the home three times on April 17, 2018. First, the officers entered the garage prior to executing the arrest

warrant. Second, the officers entered the home a few minutes after arresting Jones to conduct a protective sweep. Third, the officers entered the home to search it pursuant to the search warrant.

In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court found that, despite the Constitution's special regard for the home, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. The Court notes that the officers' initial entry into the garage was to approach a door to knock in order to arrest a fugitive on a felony warrant. At that time, the officers had reason to believe that defendant occupied the premises based on the officers' conversations with the neighbors and the information obtained through the prior investigation. Moreover, the officers reasonably believed that Jones was within the home at the time, because his car was parked in the driveway and the neighbors stated that they saw him enter the residence that morning. Therefore, the officers were permitted to enter the garage in order to knock and execute the arrest warrant. However, the Court notes that, in any case, the officers did not ultimately knock and execute the arrest warrant through the garage, nor did they use their initial entry into the garage to search for or recover any evidence. Although the officers looked inside the trash can(s) and the utility room, they were clearing the area out of concerns for officer safety. Further, no evidence or further search resulted from that initial entry.[4] Therefore, the Court finds that the officers' initial entry into the garage is immaterial in deciding defendant's motion to suppress.

---

[4] As to the odor of marijuana that provided the basis of the search warrant, the officers first smelled the marijuana when they approached the front door of the home. They did not smell marijuana while they were in the garage. In any case, Jones does not argue that the search warrant was improperly granted.

14

Second, the officers were permitted to enter the premises after arresting Jones to conduct a protective sweep of the residence. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 337 (1990). Here, Officer Ledbetter was aware of Jones's criminal history, including his March 2017 arrest. Further, the officers knew that Jones was a fugitive subject to a felony arrest warrant. As Officer Ledbetter testified, he did not know whether there was anyone else in the residence other than Jones at that time. Therefore, the officers conducted the protective sweep to ensure there was no one hiding in the house that could pose a threat to officer safety while the officers were securing the residence pending the search warrant. Officer Ledbetter and Detective Bond testified that they did not search in any areas in which a person could not hide during the protective sweep.[5] Moreover, the protective sweep latest approximately five to ten minutes and, thus, was limited in scope. As Detective Bond testified, all officers exited and remained outside the residence after the protective sweep. Further, Officer Cawiezell confirmed that, upon returning to the residence with the search warrant, all officers were outside the home. Therefore, the Court finds no evidence to suggest that any officers conducted a search for evidence or recovered any evidence at this time. Further, the Court finds that the officers were justified in conducting a protective sweep of the home.

---

[5] The Court infers from questions posed by Jones's counsel that Jones questions the credibility of the testimony regarding the protective sweep, because the officers did not search the attic over the garage. However, the officers testified that there was no observable access to the attic opening below it and the scope of the sweep must be reasonable. Based on this evidence, it was reasonable for the officers to conclude that there was no need for the sweep to extend into the attic.

Finally, the officers entered the residence the final time to execute the search warrant. Jones does not argue that the search warrant or its execution were invalid. Moreover, the Court finds credible the officers' testimony that no search for evidence occurred prior to Officer Cawiezell obtaining the search warrant.

Therefore, the Court finds that, based on the credible testimony of the three officers, the officers did not conduct any search of the residence prior to obtaining the valid search warrant. Moreover, the search warrant was not obtained based on any evidence found while the officers were in the garage during the initial entry or the protective sweep following Jones's arrest.

Accordingly, the Court finds that Jones's motion to suppress (Dkt. # 40) should be denied.

**IT IS THEREFORE ORDERED** that defendants' motions to suppress (Dkt. ## 40, 41) are **denied**.

**DATED** this 27th day of September, 2018.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE